# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00523-CV

---

**R. C., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY**
**NO. C240004CPS, THE HONORABLE ELIZABETH WATKINS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant R.C. (Richard) appeals from the trial court's order terminating his parent-child relationship with E.L.C. (Evan).[1]  By a single issue, Richard contends that the evidence is legally and factually insufficient to support the trial court's finding that termination was in Evan's best interest.  We affirm.

## I.    BACKGROUND

On June 4, 2025, the trial court held a bench trial on the Department of Family and Protective Services' (the Department's) petition to terminate Richard's parental rights.  At the outset of trial, the court heard Richard's motion for continuance.  Richard was not present at trial.  According to Richard's attorney, Richard had just completed a treatment program at a

---

[1]  To protect the child's privacy, we will refer to him and his family members using pseudonyms.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

behavioral hospital and sought additional time "so he could have the next month to continue to show the [c]ourt he was making progress." Richard had also indicated to his attorney "that he didn't have a way to get" to the trial. Richard's attorney acknowledged that "the Department made arrangements to have someone go pick him up," but "he was not there, so I don't know where my client is."

Lori Dooley, the Department caseworker assigned to this case, testified that she called workers at the addiction-recovery center where Richard was purportedly residing "approximately five times," she "called [Richard's] phone on two occasions," and she "texted him," as well. Dooley learned from others of an "incident of him trying to break [into] a female's room . . . at 3:00 a.m. [that] morning." She was also informed "that he was possibly using." The trial court denied the motion for continuance, and trial proceeded in Richard's absence.

Leah Ray, an investigator with the Department, testified that the Department became involved with the family in January of 2024, when Evan's brother, J.L. (Justin), passed away. According to Ray, Justin died after enduring "severe abuse and neglect" at the hands of S.L. (Sarah), the children's biological mother. Ray testified that Evan witnessed and was asked to participate in some of the abuse his brother suffered. Sarah's parental rights were also terminated in this proceeding. However, she does not appeal from the termination order. A judgment of conviction was admitted into evidence and indicates that Sarah pleaded guilty to injury to a child in exchange for a thirty-year sentence and dismissal of a separate charge. At the time of Justin's death, Ray testified that Richard "was incarcerated at the Runnels County jail" and being held on "three different charges: [interfering with an] emergency request for

assistance, promoting prostitution[,] and criminal mischief." According to Ray, as of the date of Justin's death, it had "been several years" since Richard had any contact with Evan.

Dooley testified that Richard "completed parenting packets while incarcerated," began counseling once released from custody, and completed either a psychological or psychosocial evaluation. In July of 2024, Richard began virtual visits with Evan. During these visits, Richard "would become frustrated, annoyed, because the caregiver was trying to take care of" another child, which resulted in Evan being "distracted, and he would be getting up and moving around." An August 2024 letter from Richard to Evan's biological mother, Sarah, was also admitted into evidence. In the letter, Richard expresses his belief that Sarah was "not guilty" and did not do anything wrong. According to Dooley, this letter posed some issues for Evan's counseling progress.

In October of 2024, Richard began in-person visitation with Evan. Dooley testified that, overall, these visits "went well"; the first visit was focused on "reestablishing the [parent-child] relationship" and during the second, Dooley, Richard, and Evan "went downtown and went to different places, and [Evan] got candy, and that went well."

However, shortly after in-person visitation began, Richard moved to Las Vegas, Nevada. Dooley attempted to arrange travel to Nevada to confirm the safety of Richard's new home, but Richard "was reluctant for [Dooley] to come to that address, and then he started saying that he was going to return back to Texas when [she] would ask him to please confirm a date that [she] could visit him in the home there in Nevada." Dooley also testified that Richard was ordered to drug test while in Nevada. Richard completed one urinalysis test which yielded a negative result. In December, Richard was asked to complete counseling "to address anger and

3

frustration issues and also protective parenting." However, Richard did not complete this counseling.

Richard returned to Texas on March 30, 2025, and submitted a clean urinalysis result on March 31. On April 9, Richard had his first in-person visit with Evan since returning to Texas. According to Dooley, this visit "did not go well." Richard "appeared agitated at the beginning of the visit because the visit was having to be held at the CPS office." During the visit, Richard accompanied Evan to the restroom. Dooley "stood outside the door and gave them ample time to use the restroom." After repeatedly asking them to leave the restroom, Dooley entered the restroom and told Richard "he needed to come on." Richard told Dooley that she "needed to get the fuck out" and she "couldn't tell him he couldn't talk to his son." Evan reportedly "looked very uncomfortable." Once the three exited to the visitation room, Dooley "announced that the visit would be ended at that time, and [Richard] got very irate."

The very next day, Richard contacted Dooley and admitted to relapsing. Richard was asked to submit to a hair-follicle test but did not do so. According to Dooley, on April 14, Richard "was arrested for public intoxication and possession." On April 30, Richard was again "arrested for public intoxication and possession." On May 1, Richard was "arrested again . . . for criminal trespass and terroristic threat." Dooley testified that Richard had not had visitation or contact with Evan since the April 9 visit. According to Dooley, termination of Richard's parental rights was in Evan's best interest because Richard had "not shown any stability" and was "not making any progress."

Records reflecting Richard's criminal history were admitted into evidence. According to these records, on September 28, 2020, Richard pleaded no-contest and was placed on probation for (1) evading arrest or detention with a vehicle, (2) terroristic threat, and

4

(3) driving while intoxicated. In February of 2022, probation was revoked for all three offenses and Richard was sentenced to three years' imprisonment for the evading-arrest offense.

S.M. (Sasha), Evan's great aunt, testified that Evan, who was seven years old at the time of trial, had been in her care since April of 2024. Sasha testified that she was "officially licensed for adoption and fostering" and intended to adopt both Evan and Evan's sister, Julia (J.L.). Sasha testified that Evan had made significant progress since coming into her care. Counseling visits were down from "every week" to "every two weeks." When he first was placed with Sasha, Evan was "scared to take a shower with the door closed," had "an issue with dressing" and "cleaning," "hated his hair," and needed "all the lights in the house . . . to be on." However, Sasha testified that Evan was able to overcome these fears and issues, and "[n]ow there's no problem." Sasha further testified that Evan was doing well in school and was overall a well-adjusted child.

According to Sasha, Evan had a tendency to "be a little angry" after visiting with Richard. Sasha believed termination was in the best interest of Evan because she was "all [Evan] knows right now" and "[s]ince everything's happened, he knows [her] as his safeguard. He knows this is his home, that is his room, and he knows [Sasha's] not going [any]where."

The CASA volunteer, Amy Harrison, observed that regular visits between Richard and Evan caused "setbacks in the progression of [Evan's] counseling," which Harrison believed was "due to [Richard's] inconsistency and unpredictability." Harrison explained that she had "watched [Evan] grow substantially in counseling. He's done well educationally. . . . He's made friends, and he's progressed well." Harrison stated that she asked Evan "if he could tell [her] who his favorite people were, who the people he felt safe with were.

5

And immediately [Evan] was able to list Ms. Dooley, CASA, [Sasha] and his counselor . . . . He did not list his father." At the conclusion of trial, the court granted the Department's petition.

On June 25, 2025, the trial court signed an order terminating Richard's parental rights on the grounds that he: (1) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered his physical or emotional well-being; (2) constructively abandoned the child; and (3) failed to comply with provisions of the court's order to secure the return of the child. The trial court found that termination was in Evan's best interest. This appeal followed.

## II. BEST-INTEREST FINDING

By his sole issue on appeal, Richard contends that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

### A. Standard of Review

A court may order the termination of the parent-child relationship only if it is shown by clear and convincing evidence that termination is in the child's best interest. Tex. Fam. Code § 161.001(b)(2). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). The heightened evidentiary standard attendant to termination proceedings "is mandated not only by the Family Code, *see* Tex. Fam. Code § 161.001, but also the Due Process Clause of the United States Constitution," *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (first citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); and then citing *Santosky v. Kramer*, 455 U.S. 745, 753–

6

54 (1982)). Because a heightened evidentiary standard applies at trial, we apply a heightened standard of review to the sufficiency of the evidence on appeal. *In re J.F.C.*, 96 S.W.3d at 264.

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

"The best-interest prong of the termination inquiry 'is child-centered and focuses on the child's well-being, safety, and development.'" *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (quoting *In re A.C.*, 560 S.W.3d at 631). Several non-exclusive factors guide this inquiry, including: (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* (citing *Holley v. Adams*, 544 S.W.2d 367,

7

371–72 (Tex. 1976)). "No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest." *A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00324-CV, 2021 WL 5911975, at *5 (Tex. App.—Austin Dec. 15, 2021, no pet.) (mem. op.). However, "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

**B.      Analysis**

"[T]he amount of contact between the parent and child and the parent's failure to provide financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the child's best interest." *A.D. v. Texas Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 717 (Tex. App.—Austin 2023, no pet.) (quoting *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied)). The evidence indicates that Richard's interactions with Evan prior to the Department's intervention were infrequent. After the Department's involvement, Richard's visits were also sporadic and often a negative experience for Evan. "Parental indifference evinces either a lack of parental ability or, worse, an unwillingness to apply one's abilities for the benefit of the child's welfare." *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.). Moreover, Richard's failure to attend trial "is one more circumstance from which the factfinder could have inferred that []he was indifferent to [his] parental rights and responsibilities." *See id.* at 826.

Richard was also unable to adequately demonstrate stable employment and safe living arrangements throughout the pendency of the case. *See In re M.S.*, 115 S.W.3d 534, 548–49 (Tex. 2003) ("Once it is clear that the parent cannot or will not provide a safe, stable family

8

environment, then the State's interest in protecting the welfare of the child shifts to establishing that safe, stable, and permanent environment for the child elsewhere."). He was also in and out of jail or prison throughout the case.

Additionally, Richard did not maintain sobriety throughout the pendency of the case and admitted to relapsing two months prior to trial. "Illegal drug use supports a finding that termination is in the best interest of the child; the factfinder may give great weight to this significant factor." *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). Although he submitted two clean drug tests, he refused to submit to a hair-follicle test after admitting to relapsing. *See A.D.*, 673 S.W.3d at 715.

By all accounts, Evan was well-adjusted in Sasha's care. The evidence indicates that Sasha and Evan were bonded, and Evan felt safe with her but not Richard. Through his progress in counseling and in Sasha's care, Evan could "do things that he couldn't do before." Dooley agreed that Sasha had "been very supportive in working through the trauma with [Evan]." Sasha also testified that she intended to adopt both Evan and Evan's sister, Julia. Although a court may not terminate parental rights merely because the child might be better off with another caregiver, *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 254 (Tex. App.—Austin 2022, pet. denied), "given the child-centered focus of the best-interest inquiry, we may not discount or minimize the level of permanence" Evan "has achieved with his foster family," *see In re J.W.*, 645 S.W.3d at 747. Accordingly, given Richard's recent criminal history, drug use, and inability to provide a safe, stable home, the trial court could have formed a firm conviction that it is in Evan's best interest to remain permanently in the care of Sasha, who is currently providing a stable, loving home and intends to adopt him. *See* Tex. Fam. Code

§ 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) ("Stability and permanence are paramount in the upbringing of a child."); *In re M.A.R.*, No. 04-01-00573-CV, 2002 WL 31015267, at *2 (Tex. App.—San Antonio Sep. 11, 2002, no pet.) (mem. op.).

We conclude that the evidence was legally and factually sufficient to support the trial court's best-interest finding, and we overrule Richard's sole issue on appeal.

### III.    CONCLUSION

We affirm the trial court's termination order.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   October 30, 2025